Filed 9/14/15  P. v. Soy CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KIRIVUDY SOY et al.,<br><br>    Defendants and Appellants. | B253692<br><br>(Los Angeles County<br>Super. Ct. No. NA074870) |

APPEALS from judgments of the Superior Court of Los Angeles County. Gary J. Ferrari, Judge.  Affirmed.

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant Kirivudy Soy.

J. Kahn, under appointment by the Court of Appeal, for Defendant and Appellant Kirivuthy Soy.

Kamala D. Harris, Attorney General, Gerald Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephani A. Miyoshi and William N. Frank, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendants Kirivudy Soy and Kirivuthy Soy of the second degree murder of Dara Ork.[1] (Pen. Code, § 187, subd. (a).)[2] The jury found that D. Soy personally used a deadly weapon, a knife, in the commission of the murder. (§ 12022, subd. (b)(1).) The jury found that T. Soy personally and intentionally used a firearm in the commission of the murder. (§ 12022.53, subd. (b).)

The trial court sentenced D. Soy to life with a minimum of 15 years with a consecutive year for the use of a knife. The court sentenced T. Soy to life with a minimum of 15 years and an additional 10 years for use of a handgun.

D. Soy appeals on the grounds that: (1) the trial court's denial of the motion to disclose juror information was an abuse of discretion; and (2) the trial court's erroneous denial of the new trial motion based on its finding that the prosecutor did not commit misconduct was a denial of his rights to due process, a fair trial, and a fair determination of guilt.

T. Soy appeals on the grounds that: (1) there was insufficient evidence to support his conviction; (2) the prosecutor committed prejudicial misconduct that caused the deadlocked jury to convict him; (3) his trial counsel was ineffective for not objecting to the prosecutor's misconduct; (4) the trial court improperly curtailed defense counsel's supplemental closing argument; (5) the denial of counsel's motion for new trial comprised an abuse of discretion; (6) the matter should be remanded with directions to reconsider the motion for disclosure of the jurors' identifying information; (7) there was insufficient evidence to support the true finding on the firearm enhancement; and (8) cumulative error compels reversal.

---

[1] All further references to Kirivudy Soy will state "D. Soy," and all further references to Kirivuthy Soy will state "T. Soy," as was the practice at trial and in the appellate briefs.

[2] All further references to statutes are to the Penal Code unless stated otherwise.

2

**Prosecution Evidence**

On the night of July 1, 2007, four young men and one young woman of Cambodian descent were in a Long Beach alley "hanging out" and drinking. The alley ran between 16th Street and 17 Street. The group included Tha Teng (the female), Sopheap Tuoth, Sean Ny, and Dara Ork. None of them had any weapons on them. At one point, D. Soy, who was known as "Coke Face," walked into the alley from 17th Street and passed the group. Teng hit him in the face as he walked by. D. Soy just kept walking toward 16th Street, and Teng followed him, trying unsuccessfully to hit him again. Tuoth and the other two men followed Teng in an effort to bring her back and calm her down. When all of them reached 16th Street, they turned left toward Alamitos Avenue. Tuoth managed to take Teng back to the alley to the same spot where they had been hanging out, but Ork and Ny did not come with them. When Ork and Ny returned, they were "amped up." They said they got into a fight with D. Soy. Ork said that D. Soy threatened to come back with a weapon.

About 10 to 20 minutes later, a two-door white car driven by T. Soy, D. Soy's identical twin, entered the alley from 16th Street.[3] The white car stopped near the group, and D. Soy and T. Soy, as well as a third person, jumped out of the car. T. Soy was the driver. D. Soy got out on the passenger side. Tuoth said he did not recognize the third person in the car. He was a male Asian with long hair, and he got out on the passenger side also. Tuoth had seen the Soy brothers before and recognized them "when [he] saw them." Tuoth saw T. Soy point a gun at Ny's chest. He also saw D. Soy run up to Teng, hit her, and knock her to the ground. D. Soy then ran over to Ork and began to fight with him. It looked like "just fist fighting." T. Soy continued to point his gun at Ny. The struggle between D. Soy and Ork "was over real quick." All three of the men who came in the white car jumped back in and took off through the alley towards 17th Street.

---

[3] Tuoth believed the white car pulled up 10 minutes after the initial incident with D. Soy, but Teng thought the time interval was 20 minutes.

Tuoth ran over to Ork and tried to pick him up. He felt that Ork was wet with something warm, and Tuoth screamed to call 911. Teng rushed over and saw that Ork was breathing "really hard" and sounded as if it was difficult for him to breathe. Teng called 911 from her cell phone.

Long Beach Police Officer Rogelio Trias responded to a 10:44 p.m. dispatch regarding a possible subject down from a gunshot at 17 Street and Alamitos Avenue. He and his partner were directed to an incident in the alley at the rear, and they arrived at that location in less than a minute. They found the victim lying on the ground, soaked in blood. The paramedics followed them into the alley and treated the victim. Ork died of multiple stab wounds (eight wounds) within several minutes due to loss of blood and inability to breathe.

Tuoth, Teng, and Ny were separated by police to be interviewed. Teng had suffered an injury to her knee, a contusion to her right eyebrow and a bruise on her right shoulder. Tuoth told Officer Trias he had never seen the men in the car before. Tuoth was very upset. Later, at the police station, Tuoth and Teng identified the Soy brothers to Detective Mendoza as the driver and passenger of the white car. They also identified photographs of the brothers from photographic lineups.

Police obtained warrants for the arrest of the Soy brothers, but they had disappeared. A deputy sheriff located and detained appellant T. Soy in January 2009 in Compton. T. Soy told the deputy he had a pistol and three magazines under an air mattress and the deputy retrieved them. In May 2010, Los Angeles police arrested appellant D. Soy in the city of Eagle Rock. He gave the name "Davy Soy."

Police spoke with Kelly San, the twins' mother. She listed the phone number 714-209-3126 in her cell phone under the name "Vuthy." Raymond McDonald, a T-Mobile employee, explained to the jury how cell phones seek out a signal from a cell phone tower. On the night of the stabbing, calls involving 714-209-3126 were made at 10:39 (from 562-599-1128, T. and D.'s father's home), 10:40 (from 562-591-6348, D.'s friend Brown's phone), and 10:42 p.m. (from 562-591-6348). These calls pinged off a tower at 1430 East Anaheim in Long Beach. A fourth call occurred at 10:44 p.m. (from 562-599-

4

1128), bouncing off a tower at 306 East Pacific Coast Highway. These two towers were the closest towers to the stabbing scene. A fifth call at approximately 10:50 p.m. (from 562-508-7179) bounced off a tower at 200½ 27th Street. All of these calls were consistent with the cell phone traveling northbound and they were all incoming to number 714-209-3126.

**Defense Evidence**

*I. T. Soy's Testimony*

T. Soy testified that he lived at his father's home at 2029 Orange Avenue in Long Beach in July 2001, although he spent a lot of time at his girlfriend's house in the San Fernando Valley. His mother lived about a mile away from his father, on 16th Street, and he had not lived with her since 2001. He worked as a security guard with an open carry firearms permit, which he received in 2002 or 2004.

Tuoth and Teng sometimes saw him getting in or getting out of his car to go to work because his car was parked on 16th Street. They sometimes yelled, "Hey, rent-a-cop." He had heard Ny and Ork were Asian Boys gang members. He was afraid of Ny. T. Soy knew Terry Teng, Tha Teng's younger brother. T. Soy introduced his brother and Terry Teng to his supervisor at work in order for them to get jobs.

At the time of the stabbing, he was driving a white Acura RSX. On July 1, 2007, he went to his father's home on Orange Avenue with his girlfriend. He left to buy cigarettes and received en route a call from his older brother Davy. Davy told him to get some liquor. T. Soy did not remember Davy calling to tell him about D. Soy being beaten.

On his way to find liquor on Martin Luther King Boulevard, T. Soy received a call from a man in the alley named Brown, who was a friend of D. Soy. Brown said, "Your brother was jumped." He drove toward the alley and stopped in front of Brown's house at 1165 East 16th Street. He spoke to him on the street. T. Soy then drove through the alley from 16th Street to 17th Street and turned right on 17th Street, made a right on Alamitos Avenue, and another on 16th Street in search of D. Soy. He then passed by his mother's home, saw it was dark, and drove back to his father's home. He stayed there

5

five or six minutes. D. Soy was there. T. Soy spoke with D. Soy and other people. D. Soy was badly hurt and disfigured. That was the first time T. Soy saw D. Soy that night. D. Soy told T. Soy that he had been "jumped." D. Soy did not identify his assailants, but T. Soy understood that they were the "usual guys that kick it in the alley over there near [his] mom's house," such as Teng and Tuoth. T. Soy left so that no one would come after him, thinking he was his twin. He thought the people who jumped D. Soy might be looking for him. T. Soy went with his girlfriend to the Pechanga casino, and then to her house. He stayed away because he did not want to get mistaken for his brother. He heard the police were looking for him, but was not sure he was not being mistaken for D. Soy. He did not try to clear his name because he did not do anything. Also, the Asian Boys gang has threatened him more than once, including while in custody.

He did not have his firearm with him the night of the stabbing. He did not threaten Ny with a gun. He saw none of the individuals involved when he drove through the alley. The gun he pointed out to the deputy under the air mattress was disassembled for safety.

T. Soy admitted that in 2000, he was placed on probation for possessing a firearm on school grounds. He denied telling a detective that he was a gang member. He said a police officer labeled him a street gang member, stamped it on his paperwork, and made up a nickname for him, "Soy Boy." T. Soy acknowledged that in 2005 he was arrested for assaulting his brother, Dara Soy, at his father's home on Orange Avenue. T. Soy admitted he had a gun and three loaded magazines in his car when he was arrested for this assault in 2005. He testified it was his work gun, and he was staying in his car at the time. He denied that he or D. Soy were members of, or associates of, the Suicidals gang—a gang that is an ally of the Asian Boys gang.

At some point around November 2008, he heard from a man named Ken who used to be with the City Attorney's Office and who knew his mother. T. Soy talked to Ken about surrendering in the company of a councilman. An attorney with whom T. Soy spoke advised him not to turn himself in yet.

6

*II. D. Soy's Testimony*

D. Soy testified that on July 1, 2007, he was walking home from a friend's house. As he walked through the alley, he encountered the "usual people" who drank and used drugs in the alley. He identified them as Teng, Tuoth, Ny, and Ork. Ny, Tuoth, Teng, and Ork were "drunk." He knew Ny was in the Asian Boys gang. He greeted Ny when he saw him. Teng was behind Ork and Tuoth.

Ork and Ny spoke to D. Soy. Teng walked up to him and, without saying a word, struck him in the back of his head. D. Soy asked why Teng had hit him. Teng said, "Because I don't like you, Nigger." Teng hit him five or six times and he tried to get away from her. He began walking backwards toward 16th Street. He did not know at what time this was. Teng kept hitting him in the face, and she took off her top shirt as if to beat him up. D. Soy tried to block her blows. Ny, Ork, and Tuoth followed Teng. Ny was encouraging Teng to hit D. Soy, and Ork was laughing. Tuoth unsuccessfully tried to restrain Teng. The three pursued D. Soy all the way to the corner of 16th Street and Alamitos Avenue. D. Soy moved toward the corner of 16th Street and Alamitos to avoid bringing the "drama" to his home. Teng's pursuit lasted four or five minutes.

At the corner, D. Soy said, "Why the bitch hit me for—hitting me for?" Ork or Ny replied, "Why do you call the home girl a bitch? Don't call the home girl a bitch." Ny and Ork "swung at [him] and started jumping [him] there." Ork kneed D. Soy in the groin. The beating lasted four or five minutes while D. Soy yelled to attract attention. He did not fight back.

D. Soy "got out" and started running towards a neighbor's house. Ork and Ny followed behind D. Soy. D. Soy saw an old Cambodian man and asked him to call the police, but the man just asked why they were fighting. D. Soy ran west down the man's driveway. Ork continued to follow him but Ny stopped. D. Soy hopped over a fence and ran toward Brown's house in the alley between 16th and 17th Streets. At the beginning of the alley on the 16th Street side, he was intercepted by Ny. Ny "blindsided" him and knocked him to the ground at the entrance of the alley. Ny began to kick D. Soy in the stomach, and D. Soy "shitted [him]self" because he was scared. D. Soy attempted to

7

crawl to Brown's house, but Ny put him in a chokehold. Ny then pulled D. Soy up to his feet by his neck and dragged him to the spot in the middle of the alleyway where Teng had first hit him. At that point, Ork came jogging up. Ork punched D. Soy in the face while Ny held him. D. Soy was having trouble breathing and tried to break away from Ny's chokehold, but he could not loosen Ny's grip.

Ork pulled out a kitchen knife and held it to appellant D. Soy's chest. Ny asked D. Soy, "Are you still going to call the cops on us? We can kill you right now and throw you in the trash can and no one would know." D. Soy thought they would kill him. He panicked and "dropped [his] whole body weight." He stepped on Ny's hand and got up. Ork then poked him in the face with the knife, and D. Soy grabbed Ork's right hand, which held the knife. At the same time, Ny was punching D. Soy from behind.

D. Soy then grabbed Ork's elbow, directed the knife toward Ork, and pushed it against him. D. Soy tried to force the knife out of Ork's hand but "end[ed] up grabbing it—grabbing it, and then [he] just started, like, you know, striking him a couple times with it." He did not know how many times he stabbed Ork but it was more than once. Ork remained on his feet. The stabbing lasted 10 to 20 seconds. Ny was still swinging at D. Soy, and D. Soy dropped the knife and ran. He ran away down the alley south onto 16th Street.

D. Soy ran to his friend Martin's house on 16th Street. Martin told him there was a cut on his face. D. Soy then ran east to his mother's house. He used the bathroom to change his boxer shorts. His mother awoke and seemed shocked because he was bloody. He told her he had been "jumped by some Cambodians in the alley." He then ran to his father's house. He climbed a fence behind his father's apartment complex, located on Orange Avenue between 20th and 21st Streets. He saw that about 15 people were gathered at his father's home. He did not know what time this was, or the time of the assault upon him, or of any of the events.

D. Soy went upstairs to his father's apartment and showered. He told the people at his father's home that he had been jumped and people were trying to kill him. The guests began to leave. D. Soy left the party and went to his friend's home. He did not know his

8

friend's last name, and he did not recall his address. A couple of days later, he left the city.[4] He was afraid Asian Boys were going to kill him. He talked to someone about turning himself in, but a lawyer told him it was not the time yet.

"Years later," D. Soy learned the police were looking for him for murder. He knew that his brother was arrested for this case in January 2009. He gave the police a false name when he was arrested because he was scared of the Asian Boys and because he did not want to go to jail.

D. Soy denied telling police that he was a member of the Suicidals gang. In 2005, D. Soy was stopped by police in the company of a man named Cho with Asian Boys tattoos. He said he did not know Cho was from Asian Boys. He thought he remembered being found riding with Cho when the police found meth in the car. D. Soy told police he was "going down for it" but "it was really Cho's stuff."

### III. Other Defense Witnesses

Davy Soy is the older brother of the Soy twins and lived in his father's home on Orange Avenue. T. Soy, Dara Soy (another brother), and their father lived there, as well, in 2007. The father's home was roughly over a half mile away from where defendants' mother lived with appellant D. Soy on 16th Street near Alamitos Avenue. Dara Soy had long hair.

On the evening of July 1, 2007, Davy Soy spoke to appellant T. Soy once or twice on the telephone. He called T. Soy from the Orange Avenue telephone and asked him to go to the store. The second call was about appellant D. Soy being in trouble as reported by their mother at "10:30-ish." Later, Davy Soy saw D. Soy, bruised and bloody, climbing over a fence at the Orange Avenue residence. D. Soy stayed for about 20 minutes. D. Soy told Davy Soy that he had been "jumped" in the alleyway. He said he had been jumped by a "dike bitch" and then by her two male friends. He did not tell Davy Soy that he had just stabbed someone.

---

[4]    D. Soy later testified he left town that night.

D. Soy went to an upstairs bathroom and cleaned himself up.  T. Soy arrived at the Orange Avenue residence about five or 10 minutes after D. Soy had left.  T. Soy was driving a white Acura two-door car.

Ban Khun is a cousin of the Soy twins.  He was at the party at the Orange Avenue home on July 1, 2007.  He saw T. Soy there at 9:00 p.m.  T. Soy left to get cigarettes and beer.  Davy Soy took a telephone call and said D. Soy was in trouble.  Davy called T. Soy.  Ban Khun saw D. Soy arrive after 10:00 p.m. looking  "panick[ed,]" and "roughed up."  His cheek was cut under his eye.  D. Soy went to the restroom.  A little while after seeing D. Soy, Ban Khun saw T. Soy arrive back at the Orange Avenue residence.  Shortly after appellant T. Soy returned, Ban Khun left at about 11:00 p.m.  D. Soy was still at the Orange Avenue residence when Ban Khun left at 11:00 p.m.

John Khun, another cousin of the Soy twins, was also at the party.  He arrived after 10:00 p.m., stayed about half an hour, and did not see either defendant at the party when he arrived.  Later, he saw D. Soy climbing over a 10-foot-high gate.  He saw that D. Soy had been beaten and had blood on his face from a cut on his left cheek.  He was out of breath as if he had been running.  When he learned D. Soy had been in a fight, John Khun soon left.  John Khun feared retaliation from the three people that had jumped D. Soy.  D. Soy told him that a woman and two men had attacked him in an alley near his mother's home.  D. Soy never told John Khun that night that he had stabbed someone.  John Khun did not remember seeing T. Soy that night.

Long Beach Police Officer Scott Miller was one of the officers who responded to the alley between 16th and 17th Streets on July 1, 2007.  He spoke to both Ny and Tuoth.  Tuoth said he had been in the alley with Ny "the whole time," and they had been drinking together.  When Officer Miller first saw Ny, Ny had blood on his shirt and hands and said he had just seen his friend get stabbed.  He said he did not want to implicate anyone. He then said his friend had been stabbed, but he was not there when it happened.  He also said he did not know the full names of his friends.  Tuoth did not appear to be upset.  Tuoth told Officer Miller that Ny was his best friend.

10

Officer Miller handed Ny off to gang detectives at the scene only because the police were busy and the detectives were assisting at the scene.

Officer Jennifer Riordan spoke with Teng on the night of the stabbing. Teng told her that she had been drinking with friends in the alley when a white sedan drove down the alley. The occupants got out of the car and rushed her and her friends. Teng was hit on the back of the head, fell to the ground, and lost consciousness. When she awoke, one of the male friends was lying on the ground and bleeding. The other two males were hovering over him and trying to wake him up. The white car was gone. Teng called 911. Teng said that two male Asians got out of the white sedan. At first she told the officer they were twins and then said she thought they just looked alike. She said one of them looked familiar, and when asked why, she could not respond. Teng said she and her friends were not gang members.

Officer Riordan said that Detective Hodgson actually discovered the crime scene and was there before Officer Riordan and Officer Trias. While she and Officer Trias were on route, they used their keyboard to state they were "on scene," but they had gone to 17th and Alamitos Avenue first.

Detective Udom Sawai was working gang detail at the time of the stabbing, and he spoke with Ny at the scene. He decided to speak to Ny after another officer had done so because, due to Ny's "body language and the way he projected himself," the detective suspected Ny knew more about the crime than he had revealed. In the end, Ny did not want to cooperate with the police. Detective Sawai was familiar with the Asian Boys gang and the Suicidals gang. They are primarily Cambodian gangs. Detective Sawai recalled that Ny had admitted being a gang member, but he did not recall which gang. Detective Sawai saw a lot of graffiti in the alley, but he did not recall specifically what type. The Suicidals and Asian Boys generally get along. Based on reports and conversations with other officers, Detective Sawai believed that the Soy brothers were members of the Suicidals gang.

In response to a hypothetical presented by the prosecutor on cross-examination, Detective Sawai stated that if one of two brothers got jumped or faced down in public, it

11

was part of the mentality of the gang member to want to retaliate. It was also part of the mentality to go and get reinforcements before engaging in retaliation.

Detective Teryl Hubert was one of the detectives assigned to investigate the murder. He determined that Tuoth was associated with the Asian Boys gang. He self-admitted in 2010, but there were contacts in which Tuoth was with gang members as early as July 2008. Teng also was associated with the Asian Boys gang as early as July 2007. Ny admitted to being an Asian Boys gang member in July 2007. There was no indication that Ork was involved in any gang.

Mary Blatz worked as the Catholic representative for the Cambodian community in Long Beach from 1992 until 2009. She was involved in many projects in aid of the community. She had known the defendants' mother, Kelly San, since 1999. Blatz also knew D. Soy and T. Soy and learned that they were wanted for murder. Blatz gave San support and helped her look for legal advice. Blatz spoke several times with a former deputy city attorney named Ken Byrd. Blatz talked with San and Ken Byrd about whether the brothers should turn themselves in. The brothers "were trying to find the conditions to turn themselves in." They "were concerned about their safety from the gang inside or outside the jail."

Detective Mendoza wrote a report regarding the former city attorney named "Ken," with whom he spoke in November 2008. Detective Mendoza was asked to telephone Ken. The detective did not recall the conversation, but it involved the defendants.

**Rebuttal Evidence**

Teng identified the voice on the 911 call as her own. She told the operator she thought someone had been shot because she saw bleeding and assumed Ork had been shot. Another lady, a neighbor, got on the line also. Ny told Teng that Ork had been stabbed. Right before she was knocked down, Tuoth, Ny and Ork were there. They were there when the car pulled up. Out of the corner of her eye, she saw Tuoth "rumbling" with someone.

12

Raymond MacDonald, the cell phone expert, testified that Kelly San was the subscriber for cell phone number 562-787-6283.  Her address was on 16th Street in Long Beach, and her home telephone number was 562-599-2099.  Two calls were made from 562-787-6283 to 714-209-3126 at 10:34:37 p.m. and 10:38 p.m. on July 1, 2007.  These calls bounced off the cell phone tower located closest to the stabbing, i.e., 1430 East Anaheim Street.  The calls were coming from San's phone and going to T. Soy's phone.  The cell phone with the number 714-209-3126 had no subscriber information because it was a prepaid phone also known as a "throw phone."  It was marked in San's phone as belonging to "Vuthy."  Both of the calls were answered.  "Answered" calls could also include calls that went to voicemail, but on incoming calls, there would be no cell sites listed for such calls.

In April 2000, Detective Roger Zottneck asked T. Soy some booking questions when he was arrested for a probation violation on a juvenile arrest.  T. Soy said that he was a member of the Suicidals gang.

In September 2005, Officer Jesus Fragoso made a traffic stop on a car in which D. Soy was a passenger.  D. Soy was in possession of mace and did not have a card authorizing him to possess it.  When he was booked, D. Soy was found to possess methamphetamine.  The car's driver was a documented Asian Boys gang member. D. Soy said he was in the gang files as a Suicidals gang member but claimed he was not a member.  D. Soy said that the driver gave him the methamphetamine to hold because the driver was on parole and did not want to get in trouble.

Detective Mendoza stated that there was a large pool of blood in front of a car and on the hood of a car in the alley.  This is where Ork was stabbed.  Detective Mendoza searched for blood throughout the alley, on other cars, and in surrounding properties.  He also looked for blood on any objects in the area.  The only blood found was in between the two cars and on the hood of the car.

13

## DISCUSSION

## I. Denial of Motion to Release Juror Information (D. Soy Issue No. 1, T. Soy Issue No. 6)

### A. *Arguments*

D. Soy and T. Soy argue that the trial court abused its discretion in denying the motion for disclosure of juror information and finding the motion to be premature, requiring reversal and remand so that the trial court can reconsider the motion and allow counsel a reasonable time to file a new motion for new trial.[5]  D. Soy contends the record establishes good cause for the disclosure of juror information in the form of prosecutorial misconduct.  T. Soy contends his motion contained a sufficient factual basis to support a reasonable belief that juror misconduct occurred.

### B. *Relevant Authority*

Under Code of Civil Procedure section 237, all personal identification information of jurors sitting on criminal cases must be sealed upon the recording of the jury's verdict. (Code Civ. Proc., § 237, subd. (a)(2).)  A person wishing access to that information may petition the court for release of the information and must support that petition with a declaration that includes facts sufficient to establish good cause for its release.  (Code Civ. Proc., § 237, subd. (b).)  The court must set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for release of the information, but it must not set the matter for hearing if there is a showing of facts that establish a compelling interest against disclosure.  (*Ibid.*)  To demonstrate good cause, a defendant must, among other things, file a petition that "sets forth a sufficient showing to support a reasonable belief that jury misconduct occurred."  (*People v. Rhodes* (1989) 212 Cal.App.3d 541, 551-552; accord, *People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322–1323.)  Furthermore, the misconduct alleged must be "'of such a character as is

---

[5]  We refer to only T. Soy's counsel in the discussion, since D. Soy's counsel did not file separate written motions or argue the motions.  T. Soy filed the motions and D. Soy joined.

14

likely to have influenced the verdict improperly.'" ( *Jefflo*, at p. 1322.) A petition to disclose juror identification information must be supported by more than mere speculation and may not be used as a "'"fishing expedition[ ]' by parties hoping to uncover information to invalidate the jury's verdict." (*Rhodes*, at p. 552.)

The trial court's determination of whether to hold a hearing is reviewed for an abuse of discretion. (*People v. Jones* (1998) 17 Cal.4th 279, 317; see also *People v. Castorena* (1996) 47 Cal.App.4th 1051, 1065.)

### C. Proceedings Below[6]

Teng's 911 call was played for the jury, and the jury was provided with a transcript. The prosecutor did not elicit evidence as to the time the 911 call was made, and the time was not shown on the transcript or recording. Officer Rogelio Trias testified that he and his partner, Officer Riordon, received a call about a shooting at 17th and Alamitos Avenue at 10:44 p.m.[7] Testimony from Detective Mendoza for the defense revealed that the call was first routed to the fire department. T. Soy's mother had the number 714-209-3126 in her cell phone as belonging to "Vuthy." Cell phone evidence showed that there were several calls involving phone number 714-209-3126 on July 1, 2007—at 10:39, 10:40 and 10:42. Then there were calls at 10:44 and 10:50 p.m. Considering the location of the towers, it appeared that T. Soy was traveling northbound. The calls were being sent to his phone.

The prosecutor asked during closing argument, "Who called [T. Soy] to the scene? There is a phone call for the mom's cell phone. Do we know if [D. Soy] placed the call? . . . Do we know for sure whether [T. Soy] met him on the street, whether they picked a location, whether [D. Soy] made it back to the house. . . ? Those are questions that might be unanswered." Defense counsel argued, inter alia, "the phone records the People produced support my client" because they showed they were incoming calls, he identified

---

**6** The facts related here are relevant to the first three issues in this opinion.

**7** Teng at first reported to the 911 operator that her friend had been shot.

15

Brown's number, and Teng and Tuoth said everything happened "quickly." On rebuttal, the prosecutor asserted that it was "10:44 when the call is going out to the police."

During deliberations the jury sent several notes to the court, some of which dealt with the evidence. The first note asked, "What do we do if there is a disagreement where a juror does not believe any of the testimony and we cannot reach a verdict?" The second note asked for T. Soy's testimony pertaining to driving through the alley. The third note asked for readback of Tuoth's testimony. The fourth note asked for the legend to defense exhibit "F" (a sketch of the crime scene). The jury also asked to see the transcript of the 911 call. The request was granted and the audio was played. Finally, the jury sent a note saying, "We need help in arriving at a verdict, we are at a stalemate on making a decision."

When the jurors were reconvened by the court, the foreperson stated that the jury members had looked at the case from every angle and could not bring the two opposing sides together. The court asked if there was any particular issue the lawyers could re-argue briefly. After speaking to another juror, the foreperson asked if they could have the lawyers talk through the time of death and the time the victim was stabbed. After further discussion among themselves in the deliberation room, the jury returned and presented five questions to be addressed by additional argument: whether Ork was pronounced dead at the scene, the time Ork was stabbed, the time T. Soy drove through the alley, what T. Soy saw in the alley, and what were the changes in Teng's testimony over the course of time, i.e., how had her story changed, if it had. The jury foreperson confirmed that the questions applied equally to each defendant. Before the jury was dismissed for the day, Juror No. 5 added that he would like an explanation of the time frame beginning with the time D. Soy walked down to the alley, the stabbing, and on through what D. Soy did immediately after the stabbing.

In his supplemental argument, the prosecutor told the jury they had three things: the cell phone records, the 911 call, and the police call history. The 911 recording started before the police call. He stated that, "by listening to the content of the recording and interfacing it with this (indicating), you can tell within seconds what time the recording

16

started." The prosecutor used the 911 call recording counter in conjunction with the police call history to calculate when the 911 call went out. He arrived at the conclusion that, "when you tie all this together, everything points to the recording starting before— before 10:41, it's 10:40 and 40 seconds—53 seconds, okay. Right around there. Why is that important? It's because now we're going to pretend for a second that what these defendants testified to is true." The prosecutor asserted that "a lot of stuff happened" before Teng got on the phone, and if T. Soy had driven through the alley he would have seen it. T. Soy said he got a call from Brown and within 20 seconds he went around the corner. The defense exhibit showed the call from Brown came in at 10:40:03. If defendant had driven through the alley "he would have seen all of this stuff happening if that were true."

The prosecutor stated, "This is the hard facts. You add it all up, you can tell on the recording when these things happened. You can tell that recording starts before 10:41. He's in the alley, according to his testimony, at the minute of 10:40. You can't reconcile that. There's no way. . . . If you look at hard evidence, it's all there. There is no way that their stories are true." In supplemental rebuttal, the prosecutor repeated, "Things have to happen before 10:40:53 if you believe their story. Okay. The stabbing has to have happened." According to the prosecutor, the 911 came in at 10:40:53 because "add nine minutes and one second to that, that would be about the time that police would be entering, fire is working on him now. Nine minutes and one second added to 10:40:53 is 10:49 and 54 seconds."

The jury resumed deliberations and returned verdicts of guilt of second degree murder approximately one hour and 20 minutes later. On October 20, 2011, T. Soy's counsel filed a motion requesting a continuance of the sentencing hearing pending determination of his new trial motion. He also filed a motion for an order releasing jurors' identifying information. Counsel argued the prosecutor committed misconduct because he argued facts not in evidence and contrary to the evidence produced at trial when he told the jury that the 911 call was made at 10:40:53. In his declaration, T. Soy's counsel stated that after the verdicts were read, he spoke to three jurors who said the

prosecutor's supplemental closing argument about the timing of the 911 call was the basis for breaking the impasse in the deliberations. Counsel stated he later spoke to the jury foreman, who said the jury members found both alleged eyewitnesses (Teng and Tuoth) unreliable and they "did not believe anything they said." The prosecutor filed an opposition on December 5, 2011. The prosecutor argued the defense motion did not establish good cause because it did not make a preliminary showing of potential jury misconduct, and the evidence sought would be wholly inadmissible, since it sought evidence of the jurors' subjective mental processes.

At the February 3, 2012 hearing on the motion, the court began by saying the motion was premature. Moreover, nothing had been provided to the court that mandated that juror information be released under Evidence Code section 1150.[8] Defense counsel for T. Soy explained that the incorrect timeline in the prosecutor's supplemental argument introduced something that was never introduced into evidence at trial and was misleading. Counsel stated he expected the prosecution to argue that the supplemental argument to the jury during deliberations was immaterial or not prejudicial within the context of the whole trial. To counter that, counsel would need testimony from the jurors attesting to the importance of the prosecutor's timeline. He believed he was entitled to talk to the jurors to ascertain whether the timeline was "something that ended up tipping the scales, so that it went from being a deadlocked jury to coming in very quickly with guilty verdicts."

After hearing from the prosecutor, who reiterated the arguments in his December 5, 2011 opposition, the court stated, "I think that predicated upon what

---

[8]     Evidence Code section 1150 provides:  (a)  Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.  [¶]  (b)  Nothing in this code affects the law relating to the competence of a juror to give evidence to impeach or support a verdict."

happens at the motion for new trial, that may open up the door as far as 1150 is concerned. But I think at this point this particular motion is premature." The court added the "issue of the timing and whatever and the supplemental argument is going to be critical and I think that's the issue that has to be analyzed. . . . Then depending upon what is show up there then we may very well get into this very issue." The court stated it would neither grant nor deny the motion, but simply take it off calendar with defense counsel's permission. Counsel replied, "Okay."

The matter was continued several times due to counsel's serious health issues and other matters. The new trial motion was heard on November 14, 2013.[9] Counsel for T. Soy again argued that the prosecutor's mistake about the timing of the 911 call was misleading and caused the jury not to believe anything T. Soy said, including his statements about the gun and what he saw or did not see in the alleyway.[10] The court asked counsel to explain what the difference of two minutes or slightly less than two minutes could have had on the jury's decision. Counsel replied that the timing was very important because if the 911 call happened earlier, as the prosecutor stated, and T. Soy was driving through the alley, the other people would have been there. Counsel stated that was why the defense asked for permission to contact the jurors—to find out what occurred. He believed it made a difference in their thinking, based on what they told him.

In his response, the prosecutor stated that the issue of the time of the call was an argument that he engaged in prosecutorial misconduct. Because counsel repeatedly emphasized it was an isolated mistake on the part of the prosecutor, it could not be

---

[9]    The trial court requested argument on the three issues in counsel's written new trial motion: sufficiency of the evidence, ineffective assistance of counsel, and prosecutorial misconduct. We discuss only the latter issue in this portion of the opinion, since that is the issue related to counsel's request for disclosure of juror information.

[10]    In the interim, the parties had obtained the fire department's incident report, which showed that the alarm came in at 22:43 on July 1, 2007, and not 10:40:53, as the prosecutor had argued.

19

prosecutorial misconduct, which requires deceptive or reprehensible methods or a pattern of egregious conduct. Moreover, defense counsel did not object, and the court repeatedly told the jury that the arguments of the attorneys were not evidence. Furthermore, the issue was a difference of about two minutes and seven seconds, and the testimony showed that would not have made a difference with respect to evaluating the truth of T. Soy's testimony about his passage through the alley in search of his brother. Also, absent reports of juror misconduct, rather than explanations of how they analyzed the evidence, it was not proper to elicit statements from the jurors after the fact. The prosecutor stated that he had "talked to the so-called hold-out juror . . . and [ ] was surprised to find that [the juror] said that this argument about the timing didn't matter to him much." But, the prosecutor added, it did not matter what the jury's thought process was, since "we can't get into that."

The court stated the defendants could not prevail on the new trial motions with respect to the issue of the prosecutor's allegedly incorrect argument because the argument did not constitute prosecutorial misconduct. It was merely a mistake, and there was no objection.

Sentencing occurred on January 10, 2014. T. Soy's counsel reminded the court of his argument at the new trial motion hearing that the prosecutor's supplemental argument about the timing was persuasive, although "we don't know."

### D. Analysis

It is clear from the record that the trial court made no final ruling per se on the motion for disclosure of juror information. Nevertheless, when the trial court found no prosecutorial misconduct (the basis for the disclosure motion) during the hearing on the new trial motion, the court foreclosed the defense from pursuing the disclosure motion and impliedly denied the motion. We conclude the trial court did not abuse its discretion in denying the defense request for juror contact information, since there was no showing of good cause to release the information, and the information sought was in violation of Evidence Code section 1150.

20

As noted *ante*, a defendant demonstrates good cause by a "sufficient showing to support a reasonable belief that jury misconduct occurred." (*People v. Rhodes*, *supra*, 212 Cal.App.3d at p. 552.) Here, there was no such showing. T. Soy's counsel asserted in his declaration that several jurors told him the supplemental timeline argument was the basis for breaking the deadlock. Although not contained in a sworn declaration, the assertion of the prosecutor, an officer of the court, that the supplemental timeline argument was not the basis for changing the mind of the "so-called holdout juror" must also be taken into account.[11] The thrust of the defense argument for disclosure thus required revelation of the deliberative process in the minds of the jurors, which calls for prohibited inquiry.

Evidence Code section 1150 allows consideration of evidence as to statements made, or conduct, conditions, or events occurring that might have improperly influenced the verdict. In this case, we know the nature of the "statements made" that allegedly improperly influenced the verdict, since the claim is that it was the prosecutor's argument, or, more precisely, the repetition of it in the jury room. The defense was clearly seeking "the effect of such statement . . . upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (Evid. Code, § 1150, subd. (a).) Evidence Code section 1150 prohibits such an inquiry. It was mere speculation that there might be some tangible evidence of misconduct that would be discovered were the defendants permitted to engage in a "'fishing expedition.'" (*People v. Rhodes*, *supra*, 212 Cal.App.3d at p. 552.) T. Soy's counsel actually stated that the defense asked for permission to contact the jurors to find out what had occurred that "made a difference in their thinking," a clear reference to the subjective thought processes of the jurors.

---

[11] The jury foreman never gave the court a breakdown of the split among the jurors. In his first note, however, he referred to "a" juror [who] does not believe any of the testimony.

21

We note that D. Soy also faults the trial court for finding the initial motion was premature. Although Code of Civil Procedure section 206, subdivision (g) allows disclosure of the information as "necessary for the [defense] to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose," the key word is "necessary." As the record shows, the trial court was not convinced that, even if the prosecutor's timeline was incorrect, it could have had any bearing on a reasonable juror's verdict. The error was a gap of two minutes and seven seconds, and the evidence did not show the alley was unoccupied at any time after T. Soy would have learned that D. Soy was in trouble. Clearly, Teng was injured and was nearby when Dara Ork was stabbed—this did not tie in with D. Soy's testimony, regardless of the small discrepancy in timing. Moreover, T. Soy's counsel, who argued the motion, acquiesced in the court's statement that the motion was premature and in taking it off calendar.

T. Soy argues that the juror misconduct consists of the jurors using the prosecutor's argument as evidence despite the trial court's admonitions not to do so. Once again, there is no showing any members of the jury regarded the argument as evidence merely because the jurors reached a unanimous verdict within approximately an hour and 20 minutes of hearing argument by the prosecutor and the two defense attorneys. In this case, the trial court repeatedly instructed the jurors that the attorneys' arguments were not evidence. (CALJIC No. 1.02.) "The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions." (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.) Furthermore, other portions of the prosecutor's argument, or even the defense argument, may have aided the jury in the task of ascertaining the truth. The prosecutor also argued in his supplemental argument that the jury should consider that although Teng told different stories, her evidence at trial was very similar to what she told the police that night. The prosecutor reminded the jury to consider Tuoth's evidence as well. He urged the jury to focus on what the two available witnesses told the police on the night of the stabbing and not to disbelieve all of Teng's testimony merely because she lied at some point. He reminded the jury that Officer Riordan reported from the scene the information she

22

received that "three male Asians approached in white Acura, possible physical altercation. And then out to 17th unknown direction."

Given the measures taken by the trial court and the lack of any showing by defense counsel that jury misconduct occurred, we find no abuse of discretion.

## II. Alleged Prosecutorial Misconduct and Denial of New Trial Motion Based on Prosecutorial Misconduct (D. Soy Issue No. 2; T. Soy Issue Nos. 2, 3, and 5)

### A. Argument

D. Soy argues that the trial court erred in finding no prosecutorial misconduct and denying the new trial motion. The prosecutor committed misconduct by arguing that the 911 call was received around 10:40 p.m. because there was no evidence adduced at trial to establish the time of the call. The prosecutor's use of facts that were neither true nor in evidence was highly prejudicial and infringed upon defendants' rights to due process, a fair trial, and a fair determination of penalty.

According to T. Soy, the trial court should have granted the new trial motion on the ground of ineffective assistance of counsel as well as that of prosecutorial misconduct. He contends his trial counsel was prejudicially ineffective for failing to object when the prosecutor argued facts not introduced in evidence and failing to request a jury admonition. T. Soy adds that the prosecutor's misconduct was willful because the prosecutor knew the 911 call did not come in at 10:40 p.m.

### B. Relevant Authority

Under state law, a prosecutor commits misconduct when he or she uses "'""deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"" [Citations.]" (*People v. Earp* (1999) 20 Cal.4th 826, 858; accord, *People v. Wallace* (2008) 44 Cal.4th 1032, 1070.) "'A defendant's conviction will not be reversed for prosecutorial misconduct' that violates state law . . . 'unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' [Citation.]" (*Wallace*, at p. 1071.) In order for a violation of the federal Constitution to occur, a prosecutor's intemperate behavior must be egregious and infect

the trial with a degree of unfairness that renders the subsequent conviction a denial of due process. (*Id.* at p. 1070.)

"'"[T]he prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom."' [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 752.) "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

The prejudicial misconduct of the district attorney before a jury is one of nine grounds for the granting of a new trial. (§ 1181, subd. 5.) The denial of a motion for new trial is reviewed for abuse of discretion. (*People v. Staten* (2000) 24 Cal.4th 434, 466.) "A trial judge is in a better position than is an appellate court to determine the probable effect of misconduct of [the prosecutor] and his conclusion on that question will not be disturbed by an appellate court unless in the circumstances it is plainly wrong. [Citation.]" (*People v. Sarazzawski* (1945) 27 Cal.2d 7, 15, disapproved on another point in *People v. Braxton* (2004) 34 Cal.4th 798, 817.)

### C. Analysis

It is true that defense counsel failed to object to the prosecutor's argument regarding the time of the 911 call. Since T. Soy also argues that this failure constituted ineffective assistance of counsel, we consider the issue on its merits.

In addressing a claim that a prosecutor has misstated or mischaracterized evidence, the California Supreme Court explained: "While counsel is accorded 'great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the evidence [citation],' counsel may not assume or state facts not in evidence [citation] or mischaracterize the evidence [citation]." (*People v. Valdez* (2004) 32 Cal.4th 73, 133–134.)

In the instant case, we believe the prosecutor's argument did not consist of evidence of matters outside the record or a mischaracterization of the evidence, but rather permissible, although apparently incorrect, inferences from police evidence of the 911 call and the running time of the 911 recording shown on the tape counter. It was for the jury to determine the reasonableness of the prosecutor's proposed interpretation of the evidence. (See *People v. Farmer* (1989) 47 Cal.3d 888, 923, overruled on another ground in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6; accord, *People v. Smith* (2003) 30 Cal.4th 581, 617 [whether inferences prosecutor draws are reasonable is for jury to decide].) The prosecutor's use of the phrases, "hard pieces of evidence," "hard facts," and "hard evidence" does not undermine this conclusion. The prosecutor was clearly stating his own opinion of what his analysis of the tangible pieces of evidence showed, and the use of such phrases is typical of the kind of "vigorous" comment on the evidence that is acceptable in closing arguments. (*People v. Hill* (1998) 17 Cal.4th 800, 819; accord, *People v. Thomas* (1992) 2 Cal.4th 489, 526 ["'[T]he prosecutor has a wide-ranging right to discuss the case in closing argument'" and "'to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper'"].) As long as it is based on the record and made in good faith, "counsel have a right to present to the jury their views on the deductions or inferences that the facts warrant. Their reasoning may be faulty, but this is a matter for the jury to decide. [Citation.]" (*Farmer*, at p. 923.) We disagree with T. Soy that the prosecutor argued in bad faith, since the record plainly shows he was convinced his analysis was correct. Finally, there was no danger the jury was led to believe that the prosecutor was aware of facts that had not been disclosed to the jury, since the prosecutor clearly explained his calculations step by step as he played the recording.

Moreover, as we have observed, the trial court instructed the jurors with CALJIC No. 1.02, which informed them, inter alia, that statements made by the attorneys during trial are not evidence. The court also instructed the jurors that it must determine what facts were proved from the evidence at trial and not from any other source. (CALJIC No.

25

1.00.)  We presume the jury followed the court's instructions in this regard.  (See *People v. Valdez*, *supra*, 32 Cal.4th at p. 114, fn. 14.)

Accordingly, because there is no reasonable basis to conclude the prosecutor's argument improperly influenced the jury's ultimate verdict, defendants have not established that the trial court's finding of no prosecutorial misconduct and its denial of the new trial motion constituted either an abuse of discretion or a denial of defendants' constitutional rights.  We conclude that the prosecutor's time calculations were not a deceptive or reprehensible method nor did they constitute egregiously intemperate conduct so as to render the trial fundamentally unfair.  (See *People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1323–1324.)

Despite defense counsel's act of falling on his sword and including ineffective assistance of counsel as a ground for the new trial motion, a defense counsel's decision whether to object in argument to statements by the prosecutor is inherently tactical and "the failure to object will rarely establish ineffective assistance."  (*People v. Maury* (2003) 30 Cal.4th 342, 419; *People v. Riel* (2000) 22 Cal.4th 1153, 1197.)  Since we have concluded the prosecutor's argument was not improper and there was no misconduct, trial counsel was not guilty of an omission, and counsel was not ineffective.  The inferences argued by the prosecutor were drawn from the evidence, and any objection or request for admonishment would not have been meritorious.  (See *People v. Price* (1991) 1 Cal.4th 324, 387.)  Moreover, T. Soy cannot establish the reasonable probability he would have realized a more favorable outcome had his attorney objected to the prosecutor's analysis of the timeline.  (*Strickland v. Washington* (1984) 466 U.S. 668, 693–694.) The trial court's instruction concerning statements of counsel minimized any prejudice.

## III.  Curtailment of T. Soy's Supplemental Closing Argument

### A.  *T. Soy's Argument*

T. Soy argues that his trial counsel deserved to have the same amount of time as the prosecutor (20 minutes) to present his case at supplemental argument.  He contends the trial court erred in denying the defense request for the same amount of time.

### B. Relevant Authority

"A criminal defendant has a well-established constitutional right to have counsel present closing argument to the trier of fact. [Citations.] This right is not unbounded, however; the trial court retains discretion to impose reasonable time limits and to ensure that argument does not stray unduly from the mark. [Citation.]" (*People v. Marshall* (1996) 13 Cal.4th 799, 854–855; see also *People v. Benavides* (2005) 35 Cal.4th 69, 110.) Section 1044 gives the trial court discretion to set reasonable time limits on argument.[12] We uphold a trial court's determinations under section 1044 unless the court patently abused its discretion. (*People v. Calderon* (1994) 9 Cal.4th 69, 79; *People v. Cline* (1998) 60 Cal.App.4th 1327, 1334.) But even if the court did abuse its discretion, the defendant must still show prejudice to win reversal. (Cal. Const., art. VI, § 13; *Calderon*, at p. 80.)

### C. Proceedings Below

After the jurors departed to discuss and specify their issues, the trial court told the parties it would give "each side, not each individual, but each side a certain amount of time to argue" the issues. The court asked the lawyers how much time they needed to argue and indicated that half an hour would be too much. The court settled on 20 minutes for each side. T. Soy's counsel argued that he and D. Soy's counsel should each have the same amount of time as the prosecutor rather than having to divide the 20 minutes between them. The court replied, "I'm not going to do that."

The prosecutor argued for 10 minutes. T. Soy's counsel argued for approximately 15 minutes, leaving D. Soy's counsel with five minutes. The court stated that D. Soy's counsel could have a little more time if needed, with the understanding that the prosecutor would get the same amount of extra time. He apparently used two more minutes, and the prosecutor was given 12 minutes for rebuttal.

---

[12] Section 1044 provides: "It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."

27

### D. Analysis

T. Soy's claim fails because the trial court's limitation was reasonable under the circumstances. T. Soy argues that in this case, his counsel had to help the jury form answers to its questions by going through the evidence in detail. T. Soy claims his counsel needed more than 10 minutes to explain the "conflict in testimony of witnesses at the preliminary examination and . . . at the present trial, and the alleged self-impeachment of important witnesses for the prosecution . . . ."

The cases defendant cites regarding time limitations on argument are distinguishable, the most obvious difference being that in the instant case we are concerned with supplemental argument, not with the standard closing argument. As the cases indicate, however, we must determine whether defense counsel was unreasonably hindered to the degree that defendants were deprived of a full and fair defense. (*People Keenan* (1859) 13 Cal. 581, 584-585.)

The record indicates the trial court acted within its broad discretion in setting a reasonable time limit for the arguments for each side. The supplemental closing arguments were defined by the jury's questions. Therefore, all of the evidence, testimony, exhibits, and charges did not have to be addressed. T. Soy's counsel actually argued for 15 minutes, and D. Soy's counsel for seven minutes, each for their own purposes. The prosecutor was obliged to address the evidence with respect to both defendants in 22 minutes total. T. Soy does not argue that 10 minutes was inadequate, but only that the prosecutor got two bites of the apple. However, it is well established that the prosecutor has the right to rebut the defense argument. In this case, there were two arguments to rebut.

Section 1093, subdivision (e) provides for closing arguments by counsel for the prosecution and the defendant, and specifies that the prosecution has "the right to close." Section 1093's provision granting the People the right to conclude the argument is grounded in the constitutional requirement that the prosecution bears the heavier burden of proof in that it must prove guilt beyond a reasonable doubt. (*In re Winship* (1970) 397 U.S. 358, 361–364.) "The prosecutor's burden of proving guilt beyond a reasonable

28

doubt at the trial on the issue of guilt justifies his closing the argument as well as opening it." (*People v. Bandhauer* (1967) 66 Cal.2d 524, 530-531.) Here, the prosecution's closing argument and rebuttal were contained in approximately 12.5 pages of the reporter's transcripts. The defense arguments together took up approximately 17 pages of reporter's transcript. A review of the defense closing argument indicates counsel thoroughly addressed Teng's credibility and the prosecutor's attempt "to extrapolate the information that he believes is in here to say when the call was made." He stated, inter alia, that "[e]verybody else has put the time that the call is coming in as 10:44." He went on to explain his interpretation of the recording. There is no reason to believe any longer argument would have resulted in different verdicts.

Finally, there has been no showing of prejudice. Defendant has not explained what he would have argued or how additional argument would have made a significant difference to his defense. T. Soy does not point to any aspect of the evidence he was unable to discuss. It must not be forgotten that defendant was convicted of second degree rather than first degree murder. Therefore, any error was harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Defendant has failed to demonstrate that the court's imposition of a reasonable time limit on his supplemental closing argument constituted an abuse of discretion, let alone that its limitation constituted a deprivation of state and federal constitutional rights.

**IV. Sufficiency of the Evidence to Support T. Soy's Conviction and the True Finding on the Firearm-Use Enhancement (T. Soy Issue Nos. 1 and 7)**

### A. T. Soy's Argument

T. Soy contends there was at most a scintilla of evidence he drove the car from which D. Soy allegedly exited before stabbing Ork, and there was no solid evidence he pointed a gun at Sean Ny and aided and abetted in the assault. He contends that even if there was sufficient evidence from which a jury could have found he drove D. Soy to the scene, his mere presence was not enough to convict him as an aider and abettor.

29

### B. Relevant Authority

"'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Bolden* (2002) 29 Cal.4th 515, 553.) The reviewing court must draw all reasonable inferences in support of the judgment. (*People v. Wader* (1993) 5 Cal.4th 610, 640.) Reversal is not warranted unless it appears that "'upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." (§ 31.) "A person is liable as an aider and abettor when (1) with knowledge of the unlawful purpose of the perpetrator and (2) with the intent or purpose of committing, encouraging, or facilitating the commission of the crime, that person (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Gibson* (2001) 90 Cal.App.4th 371, 386.)

The test of whether a person aided or abetted in the commission of an offense is "whether the accused in any way, directly or indirectly, aided the perpetrator by acts or encouraged him by words or gestures." (*People v. Villa* (1957) 156 Cal.App.2d 128, 134.) It is not necessary that the primary actor expressly communicates his criminal purpose to the defendant, as that purpose may be apparent from the circumstances. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 531–532.) In fact, aiding and abetting can be committed "'on the spur of the moment,'" that is, as instantaneously as the criminal act itself. (*Id.* at p. 532.)

An aider and abettor is guilty not only of an offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets. (*People v. Hickles* (1997) 56 Cal.App.4th 1183, 1194; see also *People v.*

*Prettyman* (1996) 14 Cal.4th 248, 289-290.) An aider and abettor is guilty of all offenses that are the natural and probable consequence of the target offense. In determining whether the nonintended crime is the natural and probable consequences of the intended crime, we do not consider whether the aider and abettor actually foresaw the additional crime, but whether, judged objectively, it was reasonably foreseeable. (*People v. Prettyman*, at pp. 261–262.)

Factors that may be taken into account when determining whether a defendant was an aider and abettor are presence at the crime scene and companionship and conduct before and after the offense, including flight. (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5.) Mere presence at the scene of a crime, knowledge of the perpetrator's criminal purpose, or the failure to prevent the crime do not alone amount to aiding and abetting, although these factors may be taken into account in determining criminal responsibility. (*People v. Garcia* (2008) 168 Cal.App.4th 261, 272–273; *People v. Nguyen*, *supra*, 21 Cal.App.4th at pp. 529–530.) "'Whether defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment.' [Citation.]" (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

### C. Analysis

We believe sufficient evidence supports the jury's verdict and true finding. Tuoth testified that D. Soy came into the alley on foot from 17th Street that night, and Teng punched him. Tuoth, Dara Ork, and Sean Ny followed Teng down the alley toward 16th Street as she attempted to strike D. Soy again. They all went to 16th Street, turned left, and were almost at Alamitos Avenue. This was the only time the alley was briefly deserted, which called into question T. Soy's claim that he drove through the alley and saw no one *after* Brown told him his brother had been jumped and had "just left." So T. Soy would not have been looking for him. Tuoth brought Teng back to the alley and to where they had all been drinking. Afterwards (two minutes later), Ny and Ork came back also and said they had fought with D. Soy. Approximately 10 minutes after that, Tuoth saw a white, two-door car come through from the direction of 16th Street. T. Soy

31

confirmed he was driving his two-door white Acura RSX that night. The car parked next to Teng's car, at which point D. Soy, T. Soy and another person jumped out, according to Tuoth. D. Soy knocked Teng down and then went to Ork. T. Soy was identified as the driver of the car. Tuoth testified that T. Soy pointed a gun at Sean Ny. It was established that T. Soy possessed a gun that he was allowed to carry for his job as a security guard. Tuoth went to help Teng while D. Soy was "fighting" with Ork. D. Soy then ran back to the car, and all three men drove away toward 17th Street. When Tuoth ran to help Ork get up, he realized he was wet with blood.

Teng also said she was "rumbling" with D. Soy and that she, Tuoth, Ny, and Ork went to the end of the alley on 16th Street. Then she and Tuoth went back to the same spot where they had been standing. Shortly thereafter, Ny and Ork returned, seemingly out of breath. Ork said D. Soy was going to come back and bring a weapon. A white car pulled up about 20 minutes later. T. Soy was driving, and D. Soy and T. Soy got out. After being hit and knocked down by one of them, Teng ran behind her car and then saw Ork on the ground.

It is true that the eyewitnesses were not consistent. It was revealed that Tuoth did not tell police about the gun. He did not mention it until he testified the first time. He also told Detective Mendoza the driver did not exit the car. The record shows that at trial Teng recanted her preliminary hearing testimony that she saw T. Soy hold a gun to someone. Teng admitted she did not see that, but Ny told her that was what happened. She lied to the district attorney and police when she said she saw "stabbing motions." At one point, she also testified to seeing the stabbing. Teng admitted she did not tell police at first that she knew who committed the crime. Teng did tell Officer Riordan at the scene, however, that the attackers were male Asians, and she thought they were twins, although she was reticent about how she knew them. She merely said she thought she knew one of them. She testified that she did not tell the truth at first because she was afraid. She said the driver hit her, and she acknowledged she was not sure who was driving. Ny told her it was T. Soy. She also admitted she did not tell police at first about her punching D. Soy.

The existence of conflicting evidence does not warrant a reversal of the convictions. "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* ( 2003) 30 Cal.4th 342, 403.) A reviewing court may not substitute its evaluation of a witness's credibility for that of the fact finder. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

In addition to the eyewitness testimony, the gang testimony of Detective Sawai informed the jury that both of the Soy brothers were members of the Suicidals gang. He stated in answer to a hypothetical question that if one of two brothers were jumped, the victim would likely seek retaliation and would look for reinforcements. Also, the cell phone records showed that someone telephoned T. Soy using Kelly San's cell phone five to 10 minutes before the 911 call was made. D. Soy testified that after his fight with Ork and Ny he went to his mother's home. Davy Soy testified that he placed two calls from the Orange Avenue residence to T. Soy to tell him that D. Soy was in trouble, as he had been informed by Kelly San during a call at approximately 10:30 p.m. Another witness, Ban Khun, corroborated Davy Soy's testimony. Those calls to and from the Orange Avenue residence occurred minutes before Teng's 911 call at approximately 10:43 p.m. A reasonable jury could have inferred from the cell phone evidence that T. Soy and D. Soy were in contact and coordinating their actions.

With respect to the firearm enhancement, the jury heard Teng testify that Ny told her T. Soy pointed a gun at him, that she did not see it herself, and that she falsely testified that she did at the preliminary hearing. The jury also heard Tuoth's testimony that he saw T. Soy point the gun. The jury was instructed that "[t]estimony concerning any fact by one witness, which you believe, is sufficient for the proof of that fact. You should carefully review all the evidence upon which the proof of that fact depends." (CALJIC No. 2.27.) The jury clearly believed Tuoth's testimony. The jury could draw the reasonable inference that T. Soy used the gun to deter Ny or anyone else from interfering with D. Soy's attack on Ork, thus acting as an aider and abettor. After D. Soy

33

finished his attack on Ork, T. Soy drove himself and D. Soy away from the scene. A reasonable jury could conclude this flight was part of a joint purpose and facilitated the murder.

As the jury was instructed, presence at the crime, companionship, and conduct before and after the crime may all be considered in deciding whether or not an individual is an aider and abettor. (CALJIC No. 3.01.) Flight may also be considered as conduct after the crime. (*In re Juan G.*, *supra*, 112 Cal.App.4th at p. 5.) And although not determinative, knowledge of the perpetrator's criminal purpose and failure to prevent the crime may be taken into account. (*People v. Garcia*, *supra*, 168 Cal.App.4th at pp. 272-273.) Considering these factors, the record here clearly supports the conclusion that T. Soy intended to aid and abet D. Soy's actions. And even if the intended crime was only an assault with a deadly weapon, the jury was also instructed on aiding and abetting within the theory of natural and probable consequences. (CALJIC No. 3.02.) Accordingly, we decline to reweigh the evidence and reevaluate the credibility of the witnesses in this case. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) We conclude there was sufficient evidence to support the finding that T. Soy aided and abetted D. Soy's crime.

## V.  Cumulative Error.

T. Soy argues that, given the lack of credible eyewitness testimony, the absence of physical evidence tying him to the killing, and the jury's reports of stalemate, the outcome of the trial would have been different for him if the trial court had foreclosed the prosecutor from arguing facts that were never in evidence. Therefore, if this court does not reverse for any of the grounds asserted in his brief, reversal is required because the cumulative effect of the errors violated his right to due process under the Fourteenth Amendment to the federal Constitution, and the violation was prejudicial.

There can be no cumulative error if each assignment of error fails. We have rejected each of defendant's assignments of error and further found that defendant suffered no prejudice in any event. Moreover, in examining a claim of cumulative error, the critical question is whether the defendant received a fair trial. (*People v. Cain* (1995)

34

10 Cal.4th 1, 82.)  As the California Supreme Court has long held, "[a] [d]efendant [is] entitled to a fair trial but not a perfect one."  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009; *People v. Mincey* (1992) 2 Cal.4th 408, 454.)  Our review of the record assures us that defendants received due process and a fundamentally fair trial.

## DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


CHAVEZ, J.


HOFFSTADT, J.